# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

STEPHANIE T. CARNEY,             :

     Plaintiff,                 :

vs.                         :       CA 17-0070-MU

NANCY A. BERRYHILL,          :
Acting Commissioner of Social Security,
                               :

      Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability and disability insurance benefits. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 23 & 24 ("In accordance with provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.")). Upon consideration of the administrative record, Plaintiff's brief, and the Commissioner's brief,[1] it is determined that the Commissioner's decision denying benefits should be reversed and remanded for further proceedings not inconsistent with this decision.[2]

---

[1]      The parties in this case waived oral argument. (Doc. 22; *see also* Doc. 25.)

[2]      Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 23 & 24 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of (Continued)

## I. Procedural Background

Plaintiff filed an application for a period of disability and disability insurance benefits on December 27, 2013, alleging disability beginning on September 30, 2013. (*See* Tr. 124-25.) Carney's claim was initially denied on March 6, 2014 (Tr. 73) and, following Plaintiff's April 3, 2014 request for a hearing before an Administrative Law Judge ("ALJ") (*see* Tr. 82-83), a hearing was conducted before an ALJ on June 17, 2015 (Tr. 37-61). On December 24, 2015, the ALJ issued a decision finding that the claimant was not disabled and, therefore, not entitled to disability insurance benefits. (Tr. 21-33.) More specifically, the ALJ proceeded to the fourth step of the five-step sequential evaluation process and determined that Carney retains the residual functional capacity to perform a range of light work and her past relevant work as a caterer helper (Tr. 32; *see also* Tr. 30). On February 22, 2016, the Plaintiff appealed the ALJ's unfavorable decision to the Appeals Council (Tr. 15); the Appeals Council denied Carney's request for review on December 12, 2016 (Tr. 1-3). Thus, the hearing decision became the final decision of the Commissioner of Social Security.

Plaintiff alleges disability due obesity, diabetes mellitus (type II), questionable history of fibromyalgia, questionable history of restless leg syndrome, hypertension, history of diabetic ketoacidosis, questionable history of acute sinusitis and bronchitis, and depression. The Administrative Law Judge (ALJ) made the following relevant findings:

---

appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

**2.     The claimant has not engaged in substantial gainful activity since September 30, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).**

**The claimant has the following combinations of impairments that is severe (20 CFR 404.1520(c)):** obesity; diabetes mellitus type II, controlled with compliance; questionable history of fibromyalgia; questionable history of restless leg syndrome[]; hypertension; history of diabetic ketoacidosis, acute; and questionable history of acute sinusitis and bronchitis. Individually, these impairments are slight abnormalities that individually do not cause greater than slight limitation in the claimant's capacity for work activity. Therefore[,] they are not severe; however[,] as noted herein, the undersigned considered the impairments collectively in assessing the residual functional capacity.

In application documents[,] the claimant[,] a forty-eight[-]year[-]old female with a general equivalent diploma (GED)[,] initially alleged her ability to work is limited by diabetes, diabetic neuropathy, depression, leg pain, migraines, memory problem, blurred vision, pain in arms, and numbness. She reported her height as 5'5" and her weight as 171 pounds. She reported she stopped working on August 5, 2010, because the business closed; however, on September 30, 2013, she reported her conditions became severe enough to keep her from working.

She reported her impairments affect her ability to lift, squat, bend, stand, reach, walk, kneel, stair climb, see, memorize, complete tasks, concentrate, understand, follow directions, and use her hands. However, she reported she can attend to her personal needs independently. She reported she can prepare meals and perform light cleaning and laundry duties. She reported she shops in stores and can handle financial obligations. She reported she enjoys watching television and she spends time with others. On appeal, she reported her neuropathy has gotten worse and she now has leg pain, numbness, and migraines. She reported everything has gotten worse including her depression. She reported this change took place in 2013.

At the hearing[,] when questioned by the undersigned[,] the claimant testified she cannot perform any work activity that requires sitting because she can only sit for minutes at a time due to pain. She testified she has to stand up, walk around, and sometimes lay down. She testified she uses a heating pad for pain and cannot sit for hours at a time without severe pain from neuropathy and fibromyalgia. She testified she takes Neurontin three times a day, Tramadol for pain, and Celexa for depression and anxiety. She testified she has not worked since 2010 and she last worked at a dry cleaner.

When questioned by her representative[,] she testified she receives treatment at The Clinic PC. She testified she has been diagnosed with diabetes mellitus II, uncontrolled, peripheral neuropathy, and back pain. She testified her treating physician referred her to mental health and also prescribes her depression medication as well as Neurontin and Tramadol. She testified she cannot function without taking the Neurontin; however, it causes dizziness and lightheadedness. She testified the only side effect of the Tramadol is she cannot operate any vehicle. She testified she takes the Tramadol every six hours. She testified she has chronic lower back pain daily and needs assistance with personal hygiene. She testified her husband provides assistance and her daughter-in-law helps out a lot. She testified her husband cooks, but she can prepare simple meals.

In regards to her diabetes mellitus type II, controlled with compliance, the claimant testified she was diagnosed with uncontrolled diabetes mellitus type II and she has painful neuropathy. The evidence does document[] a diagnosis if diabetes mellitus type II; however, when she presented to Meridian Medical Associates on December 19, 2013, it was noted her diabetes had been under good control. Although her examination indicated decreased pinprick and light touch in a stocking distribution, reflexes were depressed, but symmetrical, and Romberg's was slightly positive for swaying away. It further indicated she had normal gait and her cranial nerves were intact with 5/5 motor strength. She was assessed with painful peripheral neuropathy, possible element of restless leg syndrome, and history of diabetes. She was given a trial of Neurontin and it was recommended she follow up in a couple of months. The evidence indicates she returned to Meridian Medical Associates in February 2014 and reported the Neurontin was helping some, but [she] was still having pain when squatting. Her Neurontin was increased and it was recommended she follow up in three months.

On March 3, 2014, she returned to The Clinic PC for follow up and medication refills. It was noted she did not have any verbal complaints and again her diabetes w[as] documented as controlled. Her physical examination was unremarkable and dietary modification was recommended. It was a year later[,] on March 2, 2015, when she returned to The Clinic PC for medication refills. It was noted she was doing better and her examination was normal.

Although[] the claimant has been diagnosed with diabetes mellitus type II, the evidence documents several instances where her diabetes was controlled. Her physical examinations have been unremarkable and there is no evidence of cerebrovascular accidents, renal failure, polydipsia, or polyuria, generally associated with uncontrolled diabetes mellitus, which certainly suggests the impairment[] is well controlled. If the claimant were to remain compliant with all treatment recommendations, dietary

modifications, exercise, and medications[,] her diabetes would continue to be controlled. Therefore, the evidence does not show this impairment has significantly limited or is likely to significantly limit the claimant's ability to do basic work activities.

In regards to her questionable history of reckless leg syndrome, the evidence indicates she presented to The Clinic PC in October 2013 with fatigue and pain in her legs that hurts when walking up steps. On review of systems[,] she denied any musculoskeletal problems as well as neurological problems. Her physical examination was normal with no deformities, cyanosis, or edema of the extremities. There was no decreased range of motion in her joints. There was no sensation to pain and touch and she had normal pinprick. Her deep tendon reflexes were normal in the upper and lower extremities and her cranial nerves were normal. At that time[,] she was assessed with fatigue; however, in December 2013 she presented to Meridian Medical Associates with pain, numbness, and tingling in her lower extremities and was diagnosed with possible element of reckless leg syndrome. The evidence documents unremarkable examinations with no deformities, cyanosis, or edema of the extremities. She has normal gait and station as well as normal range of motion of her joints with no neurological deficits. Furthermore, there is no follow up treatment for this impairment and the claimant d[id] not mention this impairment at the hearing. Therefore, the evidence does not show this impairment has significantly limited or is likely to significantly limit the claimant's ability to do basic work activities.

In regards to her questionable history of fibromyalgia[,] the evidence documents a diagnosis of fibromyalgia; however, there are no follow up appointments for this impairment. The evidence does not document any widespread pain in the joints, muscles, tendons, or nearby soft tissues associated with fibromyalgia. Nor does the evidence document at least 11 positive tender points found bilaterally both above and below the waist. Furthermore, there are no objective tests or signs to confirm the severity of any observable problem of fibromyalgia. Therefore, the evidence does not document any objective findings for this impairment nor does it show this impairment has significantly limited or is likely to significantly limit the claimant's ability to do basic work activities.

In regards to her hypertension, the claimant did not mention this impairment at the hearing. She has very limited treatment for this impairment, yet the evidence documents a diagnosis of hypertension. However, there are several examinations that have documented her blood pressure as normal and her heart as having regular rate and rhythm. Furthermore, there is no evidence she has suffered any renal damage or cardiovascular accident generally associated with prolonged uncontrollable hypertension. The undersigned notes the evidence does

not show this impairment has significantly limited or is likely to significantly limit the claimant's ability to do basic work activities.

In regards to her history of diabetic ketoacidosis, acute, the evidence documents [that] she presented to The Clinic PC on March 30, 2015, with complaints of vomiting, sweating, and fatigue[]. Her examination indicated she was well appearing, well-nourished [and] in no distress. She was oriented times three and her mood and affect was normal. Examination of her abdomen and extremities w[as] unremarkable; however, it was noted since she has [had] ketoacidosis before it was recommended she go to the emergency room, but she refused. She was encouraged to continue her current medication[s] and dietary modification[s]. Approximately[] a month later[,] on April 26, 2015, she presented to Anderson Regional Medical Hospital and was admitted for diabetic ketoacidosis. It was noted she was vomiting and severely dehydrated; therefore, she was placed in intensive care and started on normal saline and an insulin drip. Within two days she was gradually weaned off the insulin drip and became stable enough to be discharged. She was discharged in stable condition with instructions to follow up with her treating physician in a week. She followed up at The Clinic PC on June 10, 2015, and her examination was unremarkable. She was assessed with fatigue, pain in back, depression, and anxiety.

Although[] the claimant was hospitalized for the above impairment, the evidence indicates it was recommended she go to the emergency room one month prior, yet she refused. She was stable within two days and did not follow up for almost two months. As stated above[,] her diabetes has been controlled with medication and if she were to remain compliant with all treatment recommendations[,] including dietary modifications, exercise, and medications[,] there is no reason to believe she would have any further acute diabetic ketoacidosis. In fact, the evidence documents she was last ketoacidosis in 2000, which clearly suggests her acute diabetic ketoacidosis is well controlled.

With her questionable history of acute sinusitis and bronchitis, the evidence documents she presented to The Clinic PC in January 2013 with complaints of a sore throat, bilateral ear pain, weakness/fatigue, hurting all over, neck pain, and cough. Her examination indicated her lungs were clear and her eyes, ears, nose, and throat were normal. She was assessed with sinusitis, acute[,] and treated with medication []. She returned in October 2013 with a sore throat and again she was diagnosed with sinusitis, acute. On April 22, 2015, she returned to The Clinic PC reporting cough and congestion and hurting in her chest at times. She reported chronic leg pain and headaches. Her physical examination indicated she was well appearing, well-nourished [and] in no acute distress. She was oriented times three with normal mood and affect. Her

lungs were clear to auscultation and percussion and her extremities did not exhibit any deformities, cyanosis, or edema. She was assessed with acute sinusitis, acute bronchitis, pain in back, and depression. There is nothing to show the claimant required any medications on a continuous basis or corticosteroids for this impairment. Furthermore, there is no indication the claimant's acute sinusitis and bronchitis caused long-term complications such as severe shortness of breath, chronic obstructive pulmonary disease, or respiratory failure.

The claimant's medically determinable mental impairments of depressive disorder, not otherwise specified[,] and anxiety, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental activities and are therefore non-severe.

In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living. In this area, the claimant has no limitation. The claimant is mentally able to initiate, sustain, and complete activities such as attending to her personal care, preparing meals, shopping, driving, managing finances, and [is] independent direction or supervision.

The next functional area is social functioning. In this area, the claimant has no limitation. The claimant can communicate clearly, demonstrate cooperative behaviors, initiate and sustain social contacts and participate in group activities.

The third functional area is concentration, persistence or pace. In this area, the claimant has mild limitation. The claimant can certainly sustain the focused attention and concentration necessary to permit the timely and appropriate completion of tasks commonly found in routine and repetitive work settings. However, the record also reveals that the claimant obtained a GED. Thereafter[,] she performed semiskilled work as a caterer helper in a family[-]owned business. That business apparently folded. The record strongly suggests that had the business [not folded] the claimant would have continued in that business. The record does not allow for a finding of greater than mild limitation in this domain.

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitations in any of the first three functional areas and "no" episodes of decompensation which would have been of extended duration in the fourth area, they are non-severe.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

In addition, the evidence documents on February 18, 2014, [the claimant] attended a consultative examination conducted by Nina Tocci, PhD, at which time she was diagnosed with depressive disorder, not otherwise specified[,] and [given a] global assessment functioning score of 60. During the mental status evaluation, the claimant's posture and gait was normal and her motor activity was unremarkable. She spoke without an impediment and her affect was appropriate, normal, and stable. She described her mood as "okay/fair". She was oriented to time, place, person, and situation and she demonstrated good attention and concentration. She demonstrated good fund of information and comprehension and her abstract was intact. She demonstrated thought content appropriate to mood and circumstances and goal-directed thought [and] organization. Dr. Tocci noted the claimant appeared to be functioning within the average range of intellectual ability and she can make informed personal and financial decisions. Dr. Tocci opined the claimant has the ability to learn, perform, and complete job tasks, but her concentration, pace, and persiste[nce] could be distracted and result in imprecise product [] secondary to pain. The undersigned does not concur with this opinion because it is inconsistent with the evidence as a whole.

On March 5, 2014, Donald Hinton, Ph.D., a State Agency medical consultant, completed a Psychiatric Review Technique Form assessing the claimant's mental impairment. Dr. Hinton opined the claimant has mild limitation in restriction of activities of daily living, mild limitations in maintaining social functioning, and moderate limitations in difficulties in maintaining concentration, persistence or pace. He found no episodes of decompensation, each of extended duration.

Dr. Hinton also completed a Mental Residual Functional Capacity Assessment indicating no more than moderate limitations in any areas.

Specifically, Dr. Hinton opined the claimant has the ability to understand, remember, and carry out many short and simple instructions. He opined the claimant can attend and concentrate for two-hour periods. He lastly opined work setting changes should be minimal, gradual, and fully explained and she may require assistance with goal setting.

On May 7, 2015, she presented to West Alabama Mental Health Center reporting problems with depression for a long time. After a screening assessment intake[,] she was assessed with major depression and recommended [to] return in two weeks. She returned on May 29, 2015, for individual counseling and it was noted her affect was normal and her mood was anxious and depressed. She was oriented to person, place, time, and situation and her motor activity was calm. She reported poor sleep and fair appetite and it was recommended she return in two weeks. The evidence does not indicate the claimant followed up for individual counseling, which clearly suggests her impairment is under control.

On June 12, 2015, the claimant's therapist completed a Medical Source Statement (Mental) on behalf of the claimant. She opined the claimant has marked limitations in her ability to understand and remember short simple instructions, understand and remember detailed instructions, and carry out detailed instructions. She opined [claimant] has moderate limitations in her ability[ies] to carry out short, simple instructions and make judgments on simple[,] work-related decisions. She also opined the claimant is markedly limited to interaction with the public, supervisors, and coworkers and markedly limited [in] responding appropriately to work pressures in a usual work setting and responding appropriately to changes in a routine work setting. The undersigned does not concur with this opinion because it is inconsistent with the evidence as a whole.

Despite the fact[ that] the evidence documents a diagnosis of depression and the record indicates some treatment[   ], the treatment has been essentially routine and/or conservative in nature with only two total visits. Interestingly, her treating physician prescribes her depression medication; however, examination[s] of her mental state have been documented as alert, awake, and oriented times three with normal mood and affect. More importantly, the evidence documents she has denied any psychiatric problems. What is more, when admitted for diabetic ketoacidosis[,] her mental state was absent any depression and anxiety and she was alert and oriented times three with normal affect. Furthermore, the evidence does not document any inpatient hospitalizations for this impairment and[, as stated above[,] she only has two visits with a mental health facility. In addition, she testified she discontinued prior mental health treatment in 2001, but reported she stopped working in 2010. The fact[] she has not had any treatment for depression in fourteen years, but continued to work,

clearly suggests the impairment is under control[] and would not prevent work activity.

The record also mentions migraines; memory problems; pain and numb[ness] in arms; blurred vision; and back problems. Despite multiple subsequent physical examinations and assessments, there is no additional mention or confirmation for the impairments. Although[] the evidence documents reported back problems throughout the record[,] [] there are no laboratory findings to suggest the severity of the impairment. In fact, the evidence documents she had normal gait and station with full range of motion of all joints. The undersigned believes these conditions are not medically determin[able] and do[] not affect the claimant's ability to work.

**3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR  404.1520(d), 404.1525 and 404.1526).**

.      .      .

**4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can stand and/or walk at least two hours without interruption and six hours over the course of an eight-hour workday. She can sit at least two hours without interruption and a total of at least six hours over the course of an eight-hour workday. She cannot climb ropes, poles or scaffolds. She can occasionally climb ladders, ramps, and stairs. She can frequently balance, stoop, kneel and crouch. She can occasionally crawl. She can frequently use her lower extremities for pushing, pulling and the operation of foot controls. She can occasionally work in humidity, wetness and extreme temperatures. The claimant can occasionally [be exposed to] dusts, gases, odors and fumes. The claimant can occasionally work in poorly ventilated areas. The claimant cannot work at unprotected heights. The claimant can occasionally work while exposed to operating hazardous machinery. The claimant can frequently work while exposed to vibration. The claimant can occasionally operate motorized vehicles.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The

undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

With regards to the claimant's physical limitations, no treating physician has offered an opinion sufficient upon which to assess the claimant's residual functional capacity. However, the undersigned notes that the above limitations are consistent with and supported by records and reports obtained from the claimant's treating physicians and with the evidence as a whole. Therefore, the undersigned finds that the above residual functional capacity assessment is supported by objective treatment evidence, treatment records, and the record as a whole.

In addition, the undersigned gives some weight to the opinion of the State agency psychological consultant[,] Dr. Robert Hinton. Although[] the functional limitations given by Dr. Hinton differ slightly from those in the residual functional capacity assessment, the undersigned finds Dr. Hinton's opinion, indicating the claimant is not disabled based on any mental impairment, is generally credible and consistent with the medical evidence of record.

In addition, the undersigned has considered the opinion of Dr. Tocci, the mental consultative examiner. Dr. Tocci assessed the claimant with depressive disorder, not otherwise specified[,] and a global assessment functioning score (GAF) of 60. She opined the claimant has the ability to learn, perform, and complete job tasks, but her concentration, pace and persiste[nce] could be distracted and result in imprecise product secondary to pain. The undersigned notes Dr. Tocci's opinion and assessments are inconsistent with records and reports and with the evidence as a whole. There is no documentation in the record to support the claimant has a moderate limitation or that her depression is at all severe. In fact, there are only two mental health visits and no inpatient mental hospitalizations. Dr. Tocci did not report any signs or symptoms for pain and[,] as stated above[,] the claimant's mental examinations have been unremarkable. Furthermore, the evidence documents the claimant stopped working due to the business closing and not because of the allegedly disabling impairment. There is no evidence of a significant deterioration in the claimant's mental condition since the business closed; therefore, the claimant's impairment would not prevent the performance of any job, since it was being performed adequately at the time. Therefore, pursuant to 20 CFR 404.1527(d)(1) [], the undersigned gives little weight to the opinion of Dr. Tocci.

The undersigned gives little weight to the Medical Source Statement (Mental) completed by Jennifer Embrey, a Licensed Professional Counselor. Ms. Embrey opined the claimant has moderate to marked limitations in each domain. However, the evidence documents the claimant was treated at West Alabama Mental Health two times and her affect was noted as normal and she was oriented times four. Besides her reports of poor sleep and fair appetite, it was noted her motor activity was calm and she denied suicidal and homicidal ideation. The undersigned notes Ms. Embrey's treating relationship with the claimant is quite brief and without substantial support from the other evidence of record, which obviously renders her opinion less persuasive. Therefore, the undersigned gives little weight to the opinion of Ms. Embrey.

The undersigned has considered the opinion of Dr. Manning and has given it little weight. Dr. Manning opined the claimant is unable to work because of her diabetes and is experiencing a lot of high readings with alternating low sugars. Normally a treating physician would be given great weight, but not if the opinion is inconsistent with her treating notes and the evidence of record. The evidence documents controlled diabetes as well as unremarkable physical examinations. Even Dr. Manning's records do not reflect objective findings consistent with her opinion. Her most recent records show the claimant as well appearing, well-nourished[, and] in no distress. There were no complications related to uncontrolled diabetes and her physical examination was unremarkable. Thus, the undersigned ha[s]

given this opinion little weight and great probative value to treatment records as a whole.

In sum, the above residual functional capacity assessment is supported by the available objective evidence[/]treatment records, the claimant's activities, the available acceptable medical sources referred to herein, to the extent such [i]s consistent with Finding of Fact Number 5.

**5.     The claimant is capable of performing past relevant work as a caterer helper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).**

The vocational expert testified that the claimant has past relevant work as a Caterer Helper (light, semiskilled, DOT Number 319.677-010) and a Machine Presser (medium, unskilled, DOT Number 363.682-018). The vocational expert was instructed to assume a hypothetical individual of the claimant's age, education, past relevant work experience, and who has the residual functional capacity set out above. The vocational expert was then queried as to whether such an individual would be able to perform the claimant's past work. The vocational expert answered that such a hypothetical individual would still be able to perform the claimant's past relevant work as a Caterer Helper.

20 CFR 404.1520(e) . . . provide[s] that an individual will be found "not disabled" when it is determined that a claimant retains the residual functional capacity to perform past relevant work. This includes performance of the actual functional demands and duties of a particular past relevant job or the functional demands and duties of the occupation as generally required by employers throughout the national economy. Given the claimant's residual functional capacity, and the testimony of the vocational expert, the undersigned finds that the claimant is able to return to her past relevant work as a Caterer Helper, and she is[,] therefore, "not disabled." In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed, pursuant to Social Security Ruling 82-62.

**6.     The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2013, through the date of this decision (20 CFR 404.1520(f)).**

(Tr. 23-29 & 30-33 (internal citations and footnote omitted; emphasis in original)).

## II. Standard of Review and Claims on Appeal

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation

> to determine whether the claimant is disabled, which considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the RFC to perform h[is] past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Commissioner of Social Sec.*, 457 Fed. Appx. 868, 870 (11th Cir. Feb. 9, 2012)[3] (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden, at the fourth step, of proving that she is unable to perform her previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. *Id.* at 1005. Although "a claimant bears the burden of demonstrating an inability to return to her past relevant work, the [Commissioner of Social Security] has an obligation to develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted). If a plaintiff proves that she cannot do her past relevant work, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable—given her age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Phillips, supra,* 357

---

[3] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

F.3d at 1237; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform her past relevant work as a caterer helper is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[4] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'" *Id.* (quoting *Crawford v. Commissioner of Social Sec.*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

On appeal to this Court, Carney asserts two reasons the Commissioner's decision to deny her benefits is in error (*i.e.,* not supported by substantial evidence): (1)

---

[4]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

the ALJ erred in finding she has no severe mental impairment and finding that she retains the mental residual functional capacity to perform semi-skilled work; and (2) the ALJ erred in finding that she has the residual functional capacity to perform light work. Because the undersigned finds that the ALJ erred to reversal with respect to Plaintiff's first assignment of error, the Court has no reason to address Carney's second assignment of error. *See Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985) ("Because the 'misuse of the expert's testimony alone warrants reversal,' we do not consider the appellant's other claims.").

A severe impairment is an impairment or combination of impairments that significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The Commissioner's regulations define basic work activities as the abilities and aptitudes to do most jobs and in analyzing step two of the sequential evaluation process, the Commissioner considers a claimant's "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b). "Step two is a threshold inquiry." *McDaniel v. Bowen,* 800 F.2d 1026, 1031 (11th Cir. 1986). Only claims based on the most trivial impairments may be rejected, and an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work. *Id.* A claimant need only demonstrate that her impairment is not so slight and its effect not so minimal. *Id.*

When evaluating whether a claimant suffers from a severe mental impairment, the Commissioner considers how the impairment impacts the following four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace;[5] and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). Where the degree of limitation is rated as "none" or "mild" in the first three functional areas, and as "none" in the fourth functional area, the Commissioner will generally conclude that the claimant does not suffer from a severe mental impairment. 20 C.F.R. § 404.1520a(d)(1).

In this case, the ALJ concluded that Carney's depression and anxiety were non-severe after concluding that the degree of functional limitation in the first three functional areas was "mild" (or that there were no limitations) and that there were no episodes of decompensation. (Tr. 27-28.) In particular, the ALJ found that Carney had mild limitation in the area of concentration, persistence, and pace because after obtaining a GED she performed semiskilled work as a caterer helper in a family-owned business and that had the business not folded, "[t]he record strongly suggests . . . the claimant would have continued in that business." (Tr. 27.) This finding is not supported by substantial evidence inasmuch as the record is clear that this family-owned business closed in 2010 (Tr. 45), approximately three years before Carney's alleged disability onset date of September 30, 2013 (see Tr. 23) and approximately four to five years prior to examining or reviewing mental health professionals indicated that Carney had difficulties in

---

[5]    "Concentration, persistence, or pace refers to the claimant's ability to sustain focused attention and concentration sufficiently long enough to permit h[er] to timely and appropriately complete tasks that are commonly found in work settings." *Jacobs v. Commissioner of Social Security,* 520 Fed.Appx. 948, 950  (11th Cir. Jun. 6, 2013) (citation omitted).

maintaining concentration, persistence, and pace because of her mental impairments (*compare* Tr. 66 & 69 *with* Tr. 239).[6] Accordingly, whether Carney would have been capable of continuing in the family-owned catering business in 2010[7] simply has no import with respect to whether Carney had limitations in concentration, persistence and pace, and consequently a severe mental impairment, on or after her alleged onset disability date of September 30, 2013, and certainly not on March 5, 2014, when the reviewing physician, Dr. Donald E. Hinton, completed a Psychiatric Review Technique indicating that Carney suffers from a severe affective disorder on account of moderate difficulties in maintaining concentration, persistence, and pace (Tr. 66) and thereafter, completed a "[n]ecessary" mental RFC assessment (*see* Tr. 69-70 (RFC assessment concluded that Carney has sustained concentration and persistence limitations in that her ability to maintain attention and concentration for extended periods is moderately limited, such that she can attend and concentrate for two-hour periods, and her ability to carry out detailed instructions is moderately limited; however, her ability to carry out very short and simple instructions is not significantly limited, nor is her ability to sustain an ordinary routine without special supervision or to make simple work-related decisions, etc.)). Interestingly, the ALJ accorded "some" weight to Dr. Hinton's opinion (Tr. 31) but then curiously states that "the functional limitations given by Dr. Hinton differ

---

[6]     In addition, the medical records indicate that a licensed professional mental health counselor indicated on June 12, 2015, that Plaintiff's ability to understand, remember and carry out instructions was affected by her depression and anxiety (Tr. 337-38).

[7]     Plaintiff's hearing testimony is clear that when she worked for her aunt, her aunt accommodated her "health problems." (Tr. 45 ("I worked for my aunt, wh[o] had a catering business. She understood my situation. She worked with me as far as my situation and she closed her business in 2010. And I knew that nobody else would be as reasonable and work with me as she did as far as my health problems.")).

slightly from those in the residual functional capacity assessment" (*id.*), even though the ALJ's RFC assessment contains no mental functional limitations (Tr. 30), much less mental functional limitations that differ only slightly from those noted by Dr. Hinton in his mental RFC assessment (*compare id. with* Tr. 69-70).[8] And, of course, it bears repeating that Dr. Hinton set forth mental functional limitations as part of a mental RFC assessment only after concluding that Carney had a severe impairment (*see id.* at 66 & 68-70).

In light of the foregoing, it is clear that substantial evidence does not support the ALJ's step two finding that Carney's mental impairments were not severe, inasmuch as the medical evidence demonstrated that her mental impairments caused her difficulties in maintaining concentration, persistence and pace. *See Delia v. Commissioner of Social Security,* 433 Fed.Appx. 885, 887 (11th Cir. Jul. 14, 2011) ("Substantial evidence does not support the ALJ's finding, at step two, that Delia's mental impairments were not severe because the medical evidence showed that these impairments did cause restrictions in daily living, social functioning, and maintaining concentration, persistence, or pace."). However, provided the ALJ finds at least one severe impairment, *see Tuggerson-Brown v. Commissioner of Social Security,* 572 Fed.Appx. 949, 951 (11th Cir. Jul. 24, 2014) ("[W]e have recognized that step two requires only a finding of 'at

---

[8]       As set forth *infra*, the ALJ clearly intended to include mental functional limitations in his RFC assessment similar to Dr. Hinton's limitations, which he at no time rejects (*see* Tr. 31), and, instead, prominently cites (Tr. 28 ("Dr. Hinton also completed a Mental Residual Functional Capacity Assessment indicating no more than moderate limitations in any area. Specifically, Dr. Hinton opined the claimant has the ability to understand, remember, and carry out many short and simple instructions. He opined the claimant can attend and concentrate for two-hour periods. He lastly opined work setting changes should be minimal, gradual, and fully explained and she may require assistance with goal setting.")).

least one' severe impairment to continue to the later steps."),[9] and gives "full consideration to the consequences of [the claimant's] mental impairments on [her] ability to work at later stages of the analysis,[10] [any] error at step two [i]s harmless and is not cause for reversal." *Delia, supra,* 433 Fed.Appx. at 887 (citation omitted; footnote added). Here, of course, is where the ALJ committed reversible error inasmuch as the ALJ did not give full consideration to the consequences of Carney's mental impairments on her ability to work at later stages of the analysis.

In reaching his RFC determination, at step four, it is clear that the ALJ in this case gave no consideration to the consequences of Carney's mental impairments on her ability to work inasmuch as neither that assessment (*see* Tr. 30), nor the hypothetical posed to the vocational expert (*see* Tr. 56) upon which the ALJ relied to find Carney not disabled (*compare id. with* Tr. 30 & 32), contain mental functional

---

[9]    The ALJ did that in this case. (*See* Tr. 23.)

[10]    "At steps three, four, and five, the ALJ considers the claimant's entire medical condition, including impairments that are not severe at step two." *Delia,* 433 Fed.Appx. at 887, citing *Jamison v. Bowen,* 814 F.2d 585, 588 (11th Cir. 1987); *see also Tuggerson-Brown, supra,* 572 Fed.Appx. at 951 ("While the ALJ did not need to determine whether every alleged impairment was 'severe,' he was required to consider all impairments, regardless of severity, in conjunction with one another in performing the latter steps of the sequential evaluation [process]."); *Sanchez v. Commissioner of Social Security,* 507 Fed.Appx. 855, 858 (11th Cir. Feb. 8, 2013) ("Before reaching step four, the ALJ must assess the claimant's RFC—which is the most work the claimant can do despite her physical and mental limitations—by considering all of the relevant medical and medically determinable impairments, including any such impairments that are not 'severe.' In assessing the RFC, the ALJ must consider the claimant's ability to meet the physical, ***mental***, sensory, and other requirements of work." (citations omitted; emphasis supplied)).

Although this Court's focus is on step 4, it bears noting that the ALJ failed to consider Carney's mental impairments at step 3 (*see* Tr. 29-30 (no mention of Carney's mental impairments or any mental listings, such as 12.04)), though this is required, *Delia, supra,* 433 Fed.Appx. at 887 ("At steps three, four, and five, the ALJ considers the claimant's entire medical condition, including impairments that are not severe. . . . The ALJ considered Delia's mental impairments at steps three, four and five."). This error simply constitutes an additional basis why this action need be remanded for further consideration.

limitations found in the record (*compare* Tr. 30 *with, e.g.,* Tr. 69-70 (indicating Carney's ability to understand and remember detailed instructions is moderately limited, as is her ability to carry out detailed instructions and to maintain attention for extended periods— although she can attend and concentrate for two-hour periods—[11] and that her ability to respond appropriately to changes in the work setting is moderately limited, as is her ability to set realistic goals or make plans independently of others, such that work setting changes should be minimal and gradual and she may require assistance with goal setting; however, Dr. Hinton did indicate that Carney's ability to understand, remember, and carry out very short and simple instructions is not significantly limited, nor is her ability to make simple work-related decisions) & Tr. 239 ("She has . . . isolation[] and anhedonia. She has the ability to learn, perform, and complete job tasks but her concentration, pace, and persiste[nce] could be distracted and result in imprecise product secondary to pain.")), though the ALJ specifically insisted he did include such mental functional limitations in his RFC assessment (*see* Tr. 31 ("Although[] ***the functional limitations given by Dr. Hinton differ slightly from those in the residual functional capacity assessment*** . . . ." (emphasis supplied)). Given that the ALJ obviously intended to include mental functional limitations (similar to those

---

[11] As previously indicated, the Commissioner's regulations make clear that basic work activities include the ability to understand, carry out, and remember simple instructions; the ability to use judgment; the ability to respond appropriately to supervision, coworkers, and usual work situations; and the ability to deal with changes in a routine work setting, 20 C.F.R. § 404.1522(a), all of which are addressed in some manner by Dr. Hinton (*see* Tr. 69-70) but not in the ALJ's RFC assessment (*see* Doc. 30) or his primary hypothetical posed to the VE (*see* Tr. 56).

noted by Dr. Hinton) in his RFC assessment (*id.*),[12] this cause is due to be remanded to the Commissioner for further consideration, particularly since "the Commissioner's policy *requires* ALJs to be more detailed in evaluating a claimant's RFC at step four than in assessing the severity of mental impairments at steps two and three." *Hines-Sharp v. Commissioner of Social Security,* 511 Fed.Appx. 913, 916 (11th Cir. Mar. 6, 2013), citing *Winschel v. Commissioner of Social Security,* 631 F.3d 1176, 1180 (11th Cir. 2011); *cf. Sanchez, supra,* 507 Fed.Appx. at 859 (affirming fifth-step denial of benefits where the ALJ's RFC assessment and hypothetical questions to the VE accounted for all of the claimant's mental limitations, including any limitations attributable to BPD, which the ALJ failed to identify as a severe impairment). Had the ALJ included the mental functional limitations he obviously intended to include in his RFC assessment, and his hypothetical to the VE, this Court would have no cause to remand this step 4 case, *see Hines-Sharp, supra,* 511 Fed.Appx. at 916 & 917 (affirming step 4 denial of benefits where the ALJ "did not simply restrict the hypothetical to unskilled work," but also included in the hypothetical the findings that the claimant had "'marked limitations in understanding and remembering complex instructions,' carrying out those instructions, and 'making judgments on complex work-related

---

[12]     Certainly, that this is what the ALJ should have done here is clear given that the ALJ found Carney's "physical" impairments (that is, obesity, diabetes mellitus, history of fibromyalgia, history of restless leg syndrome, hypertension, history of diabetic ketoacidosis, and history of acute sinusitis and bronchitis) to be non-severe individually but nonetheless "considered the impairments collectively in assessing the residual functional capacity[]" (Tr. 23), and elsewhere signaled that he was doing this with respect to Plaintiff's mental impairments (*see* Tr. 27 ("The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, **the following residual functional capacity assessment** reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis." (emphasis supplied)).

decisions,' along with 'moderate limitations in responding appropriately to usual work situations and to changes in a routine work setting . . . .'"); however, his failure to do so requires a remand as it constitutes reversible error, *see id.*; *compare id. with Dial v. Commissioner of Social Security,* 403 Fed.Appx. 420, 421 (11th Cir. Nov. 18, 2010) (in a case where the ALJ denied the claimant's application on the basis that he could perform his past relevant work and other work in the national economy, remand was required where hypothetical to the VE did not include all of the claimant's employment limitations); and *Hennes v. Commissioner of Social Security Admin.,* 130 Fed.Appx. 343, 346 (11th Cir. May 3, 2005) (affirming ALJ's fourth-step denial of benefits where the hypotheticals to the VE comprised all of the claimant's impairments), particularly since the limitations noted by Dr. Hinton (*see* Tr. 69-70) appear to be inconsistent with Carney's past relevant semiskilled work as a caterer helper (*see* Tr. 59 (VE's testimony that claimant could not perform her work as a caterer helper if she was limited to simple, routine, and repetitive work activity)), *see Pinion v. Commissioner of Social Security,* 522 Fed.Appx. 580, 582 (11th Cir. Jun. 19, 2013) ("Where an ALJ determines at step two of the sequential evaluation process that the claimant's mental impairments caused limitations in concentration, persistence, or pace, the ALJ must include those limitations in the hypothetical questions posed to the VE. However, the ALJ may instead include in the hypothetical questions **the limitation that the claimant is restricted to unskilled work if the medical evidence shows that the claimant can perform simple, routine tasks or unskilled work despite her limitations in concentration, persistence, or pace.**" (citations omitted; emphasis supplied)).

In light of the foregoing, and, in short, because the ALJ in this case did not give full consideration to the consequences of Carney's mental impairments at steps three and four of the sequential evaluation process, his error at step two was harmful (not harmless) and is cause for reversal and remand for further consideration not inconsistent with this decision.

## CONCLUSION

It is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g), *see Melkonyan v. Sullivan*, 501 U.S. 89, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991), for further proceedings not inconsistent with this decision. The remand pursuant to sentence four of § 405(g) makes the plaintiff a prevailing party for purposes of the Equal Access to Justice Act, 28 U.S.C. § 2412, *Shalala v. Schaefer*, 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993), and terminates this Court's jurisdiction over this matter.

**DONE** and **ORDERED** this the 7th day of March, 2018.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**